SLOAN FILTER CO. v. PORTLÀND GOLD MIN. CO.

(Circuit Court of Appeals, Eighth Circuit.   June 22, 1905.)

No. 2,008.

1. PATENTS—PATENTABLE INVENTION—EMPLOYMENT OF MECHANICAL SKILL.

The result of the application of the common skill and experience of a mechanic, which comes from the habitual and intelligent practice of his calling, to the correction of some slight defect in a machine or combination, or to a new arrangement or grouping of its parts, tending to make it more effective for the accomplishment of the object for which it was designed, not involving a substantial discovery, nor constituting an addition to our knowledge of the art, is not within the protection of the patent laws.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Patents, § 17.]

2. SAME—IMPROVEMENTS NOT PATENTABLE.

The mere use of known equivalents for some of the elements of prior structures, the substitution for one material of another known to possess the same qualities, though not in the same degree, and the mere carrying forward or more extended application of the original idea, involving a change only in form, proportions, or degree, and resulting in the doing of the same work in the same way and by substantially the same means, are not patentable, even though better results are secured; and this is the case, although what preceded rests alone in public knowledge, and not upon patent.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Patents, § 23.]

3. SAME—EQUIVALENT PARTS—COMBINATION PATENT.

The doctrine of equivalents applies to patents for a combination, although the measure of its effect in the particular case depends upon the position of the patent in the art to which it relates.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Patents, § 28.]

4. SAME—INVENTION—BARREL FILTER.

The Sloan patent, No. 587,874, for a barrel filter for use in the filtration of precious metal solutions, as in the chlorination process, is void for lack of patentable invention; the elements of the combination being old, and the device of the patent differing from those of the prior art only in the substitution of equivalent parts or materials, or in improvements requiring only the exercise of mechanical skill.

Appeal from the Circuit Court of the United States for the District of Colorado.

This is an appeal from a decree dismissing the bill of complaint in a suit to restrain the infringement of a patent. The appellant, the Sloan Filter Company, sued as the successor in title to Edward D. Sloan, patentee in letters patent No. 587,874, issued August 10, 1897, for improvements in barrel filters for use in the filtration of precious metal solutions, as in the chlorination process.

The claims of the patent are:

"(1) In a barrel filter, the combination with a suitable barrel or cylinder, of a flat perforated floor, a sheeted filtering medium flatly laid thereon, a wooden framing for said floor, composed of lateral and longitudinal parts spaced and united by appropriate mortising, a grating overlying the filtering medium, a series of lateral tie bars on said grating, abutments at the sides of the interior of the barrel overlying the ends of the tie bars, and wedges which are tightly interposed between said abutments and tie bars, and firmly lock all of the parts of the filter and its framing in position with relation to each other and to the barrel, substantially as described.

"(2) In combination with a suitable barrel or cylinder, a flat perforated lead floor, a framing beneath said floor affording a firm support, as well as suitable space below for the passage of filtered liquid, a suitable sheeted filtering medium flatly laid on said floor and beyond its sides and ends, and a grating

adapted to be firmly clamped for confining the filtering medium upon the floor, and binding its edges against the interior sides of the barrel, and lateral wedge bars, which are actuated by the pressure of the grating and bind the ends of said filtering medium against the interior ends of the barrel, substantially as described.

"(3) In a barrel filter, the combination with a suitable bed or support and a perforated lead floor, of a filtering medium composed of lead in sheeted form, open to the filtering passage of liquid, substantially as described."

A barrel filter, as used in the chlorination of gold ore, and possessing the elements claimed by Sloan to be novel, may be briefly described as follows: A lead-lined steel barrel or cylinder, with cast iron heads, is arranged horizontally, and equipped at each end with trunnions resting upon bearings, so that it may be revolved upon its horizontal axis. Wooden segments or horses, with lower edges conforming to the curvature of the barrel, are placed at intervals along the bottom as a primary support for a floor. The lower edges of the segments are notched to permit of the free flow of liquid along the bottom, and the upper edges are also notched to receive longitudinal stringers, which are correspondingly notched so as to form a mortise. Across the stringers and into notches on the upper side thereof are placed transverse riffles. This arrangement, being entirely composed of wood, constitutes the support for a flat, perforated lead sheet, which is the floor of the filtering medium. The perforations in the lead sheet are approximately five-sixteenths of an inch in diameter and about one-half of an inch between centers. Upon this floor is placed a filtering medium, consisting of sheeted lead with much smaller and more numerous perforations. On top of this are placed wooden gratings or racks, constituting a holding down arrangement, and also designed to prevent the abrasion of the filtering medium beneath. These in turn are held down by transverse wooden binders, extending from side to side of the interior of the barrel; the ends of the binders extending underneath longitudinal beams, which are securely fastened to the sides of the barrel by bolts extending through the shell to the exterior thereof. Between the ends of the binders and the under side of the longitudinal beams are driven wooden wedges, for the purpose of holding the structure more securely in place. For the reception and discharge of the materials and the various parts of the filtering apparatus, the barrel is equipped with suitable openings, which are so arranged as to permit of hermetic sealing.

The operation of the filter in the treatment of gold ore is substantially as follows: The ore being crushed, and generally roasted, is mixed with water, thus constituting a pulp of the proper consistency, and is placed in the barrel upon the structure which has been described. Chlorine gas is then either injected into the barrel or is generated therein by the admixture of sulphuric acid and chloride of lime. The apertures are sealed, and the action of the gas upon the gold-bearing pulp is accelerated by the rotation of the barrel. In due course the gold values in the form of gold chloride are extracted from the pulp, pass through the perforations in the filtering sheet and the lead floor to the space beneath, and are thence drawn off for further treatment. The worthless residuum is then discharged by opening and reversing the barrel.

By the old method, which preceded the placing of the filter within the barrel, the filtering was generally done in a separate stationary open tank. This method was neither economical nor healthful, so about six years before Sloan's invention there was successfully used a barrel filter, which possessed almost all of the features of the one described in the patent in suit, and in which the chlorination and the filtering were combined in a single operation. In fact, Sloan first received his instruction in the art from the man who designed and successfully operated a barrel filter in 1890. An important consideration in the making of every filter used in that process was the selection of materials that would resist the corrosive action of chlorine gas. Iron was quickly eaten away. Hardwood was also subject to it, but its reasonable duration of life and its abundance rendered its use economical, and, besides, it was best adapted for the supporting and binding framework of the filter. The effect of the gas upon lead was slight. Upon pure asbestos there was practically none. It was also necessary that the parts of the filter be so arranged as to be readily separated and detached, in order that they might be passed out of the manhole when the necessity for repairs or replacement arose.

The only features of the patented combination which require attention on account of the claim of novelty are: (1) The mortising of the timbers of the supporting framework; (2) the use of wooden wedges between the ends of the transverse binders and the horizontal rails bolted to the shell of the barrel; (3) the floor of perforated lead; and (4) the filtering medium of lead in sheeted form open to the filtering passage of liquid. Aside from these matters there is no substantial controversy requiring consideration. In all other material respects the arrangement and elements of the filter were old in the art. The defenses which need be considered were prior use and description in printed publications and lack of invention. The mortising of the timbers and the use of the wedges was to give rigidity and stability to the framework. It was found in practice that the underlying segments would become bunched together during the revolution of the barrel, thereby tending to cause a collapse of the structure, and that sometimes the framework would break up, because not properly tightened at the top. There was evidence, however, that prior to Sloan's invention wedges had been used for the same purpose, and also to some extent a mortising of the timbers. Prior to Sloan's invention the arrangement most generally employed as a floor for the filtering medium consisted of hardwood boards laid upon the segments, the upper sides of the boards being corrugated and perforated; and the filtering medium laid thereon was generally asbestos cloth held down by the wooden racks, and those in turn by transverse binders, the ends of which, being beveled, were driven under the horizontal rails at the sides of the barrel. In this way the ends of the binders acted as wedges.

There was an earnest contention, supported by substantial testimony, that Sloan had nothing more to do with devising the arrangement of the framework of the filter than to follow the suggestions of his superiors, who superintended and directed the construction during the time he says he conceived his invention; but this feature of the case need not be considered. The use of lead and knowledge of its value in the chlorination process was old. For many years prior to Sloan's invention it had been used for lining chlorine barrels and other receptacles. Sloan's application was filed November 7, 1896, and his patent was dated August 10, 1897. In 1890 and continuously thereafter lead was in general use for lining barrel filters and protecting the exposed portions of iron bolts and rods in the interior. Indeed, it may be said to have been exclusively used for those purposes. Prior to Sloan's invention it had also been used as a coating, by being burned on perforated sheet-steel plates used as the supporting floors of barrel filters and upon iron grating used as holding-down racks. Perforated sheets of lead had been placed upon corrugated and perforated hardwood planks, also used as floors in barrel filters. Perforated sheets of lead had been placed over asbestos cloth as a filtering and retarding medium. As a filtering medium lead had been used in the form of a composite lead wire and asbestos cloth, and also alone in sheeted form with slotted apertures, instead of perforations. Sheets of lead had also been used for floor purposes by Sloan himself more than two years before the date of his application, though not advantageously, because they were not of sufficient weight. Years before lead had been used as a filtering medium in a stationary tank in Canada. An iron grating, covered with lead and used as a floor, was described in the publication "Metallurgy of Gold," published in London in 1894; but it was not durable, because of imperfections in the lead coating. Perforated lead, covered with asbestos, was used as a separating medium between the generating and chlorinating chambers in the Sutton patent, No. 527,899, dated October 23, 1894; and its use in other ways, though perhaps not so pertinent to this case, was described in other patents for improvements in filters.

Leonard E. Curtis and K. R. Babbitt (Rufus C. Thayer, on the brief), for appellant.

C. S. Thomas and Alfred J. O'Brien (A. T. Gunnell, H. N. Hawkins, J. A. Chinn, W. H. Bryant, H. H. Lee, and Ed. F. Richardson, on the brief), for appellee.

Before SANBORN and HOOK, Circuit Judges, and LOCHREN, District Judge.

HOOK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The result of the application of the common skill and experience of a mechanic, which comes from the habitual and intelligent practice of his calling, to the correction of some slight defect in a machine or combination, or to a new arrangement or grouping of its parts, tending to make it more effective for the accomplishment of the object for which it was designed, not involving a substantial discovery, nor constituting an addition to our knowledge of the art, is not within the protection of the patent laws. Gates Iron Works v. Fraser, 153 U. S. 332, 14 Sup. Ct. 883, 38 L. Ed. 734; Florsheim v. Schilling, 137 U. S. 64, 11 Sup. Ct. 20, 34 L. Ed. 574; Hollister v. Benedict Mfg. Co., 113 U. S. 59, 5 Sup. Ct. 717, 28 L. Ed. 901; Atlantic Works v. Brady, 107 U. S. 192, 2 Sup. Ct. 225, 27 L. Ed. 438; Dunbar v. Meyers, 94 U. S. 187, 24 L. Ed. 34; Hotchkiss v. Greenwood, 11 How. 267, 13 L. Ed. 683; Adams Electric Ry. Co. v. Lindell Ry. Co., 77 Fed. 432, 23 C. C. A. 223; Tiemann v. Kraatz, 85 Fed. 437, 29 C. C. A. 257.

The mere use of known equivalents for some of the elements of prior structures; the substitution for one material of another known to possess the same qualities, though not to the same degree; the mere carrying forward or more extended application of the original idea, involving a change only in form, proportions, or degree, and resulting in the doing of the same work in the same way and by substantially the same means—is not patentable, even though better results are secured; and this is the case, although what preceded rests alone in public knowledge and use, and not upon patent. Market Street Cable Ry. Co. v. Rowley, 155 U. S. 621, 15 Sup. Ct. 224, 39 L. Ed. 284; Wright v. Yuengling, 155 U. S. 47, 15 Sup. Ct. 1, 39 L. Ed. 64; Adams v. Stamping Co., 141 U. S. 539, 12 Sup. Ct. 66, 35 L. Ed. 849; Burt v. Evory, 133 U. S. 349, 10 Sup. Ct. 394, 33 L. Ed. 647; Brown v. District of Columbia, 130 U. S. 87, 9 Sup. Ct. 437, 32 L. Ed. 863; Crouch v. Roemer, 103 U. S. 797, 26 L. Ed. 426; Roberts v. Ryer, 91 U. S. 150, 23 L. Ed. 267; Smith v. Nichols, 21 Wall. 115, 22 L. Ed. 566; Hicks v. Kelsey, 18 Wall. 670, 21 L. Ed. 852; National Hollow Brake-Beam Co. v. Interchangeable, etc., Co., 106 Fed. 693, 45 C. C. A. 544; National Folding Box & Paper Co. v. Lithographic Co., 81 Fed. 395, 26 C. C. A. 448.

The doctrine of equivalents applies to patents for a combination, although the measure of its effect in the particular case depends upon the position of the patent in the art to which it relates. National Hollow Brake-Beam Co. v. Interchangeable, etc., Co., supra.

The mortising of timbers to prevent them from shifting and sliding, and thereby to secure rigidity and stability of the framework, and the use of wooden wedges for a similar purpose, was nothing more than would naturally occur to any carpenter who understood his business. Mortising and the use of wedges are as old as carpentry itself; and, when the contemplated use of the structure precluded the employment of nails or other metallic fastenings, the method adopted by Sloan was but a simple and obvious expedient. It was not invention.

In the use of sheets of perforated lead as a flooring and as a filtering medium in a barrel filter there was on the part of Sloan neither discovery nor such ingenuity of adaptation as entitled him to a patent. No new function was performed by those elements of his filter, acting either singly or in co-operation with the others; nor was there a new method of performing an old one. The use of lead, and its especial value in the interior of barrel filters, were old in the art. In the floor of Sloan's filter the perforated sheets of lead performed in the same way the precise function theretofore performed by the lead-covered steel sheets, and by the perforated hardwood boards, either with or without the superimposed lead sheets; and as a filtering medium their precise function was theretofore performed by asbestos cloth, slotted sheet lead, and woven lead in combination with asbestos. They were, respectively, substitutes for each other, being well known to possess like qualities and to operate in the same way to produce the same results. The sheets of lead, in their relation to the other elements of the combination and their co-operative action, were the mere equivalents of those in prior use. There was no change of function, operation, or result. This seems to have been recognized, in part at least, by Sloan himself. He says in his specifications:

"A woven lead fabric is believed to be a novel filtering medium in this connection, and, while the best results will accrue from its use, the asbestos cloth is a valuable substitute therefor; but quite desirable results will accrue from the use of properly perforated sheet lead."

In fact, Sloan never used a woven lead fabric as a filtering medium, but in practice confined himself to the perforated sheets, while the use of asbestos cloth was common and extensive before he had any knowledge whatever of barrel filters.

In the briefs of both parties it is said that the real operation of the sheeted lead filtering medium was to support the coarser particles of ore above it, and to cause them to act as the true filtering medium. In other words, the pulp resting upon the diaphragm was the real filtering medium, and the operation of the perforated lead was merely to retard or prevent its passage during the process of filtration. If this view be correct, and there is support for it in the testimony, it would occur to any one that the office of a retarding medium could clearly be as well performed by any durable material susceptible of stable perforation and capable of resistance to the action of chlorine gas.

Were we to exclude from consideration the lead-covered steel plates, the slotted sheets of lead, and the woven lead in combination with asbestos, upon the ground, as claimed, that they were experiments and had been discarded for better devices, there would still remain the flooring of corrugated and perforated hardwood, with and without the cover of lead sheets, and the filtering medium of asbestos, both in combination with perforated sheets of lead and without it, all of which appear in the prior art, and to have been operated successfully before Sloan's invention. We would, therefore, be brought to no different conclusion.

The decree of the Circuit Court is affirmed.